**In re GORDON'S TRANSPORTS, INC., Debtor in Chapter 7 (Originally filed under Chapter 11).**

**A.J. CALHOUN, Trustee, Plaintiff,**

**v.**

**GENERAL MILLS, INC., Defendant.**

Bankruptcy No. 83–20481.
Adv. Nos. 84–0262, 85–0011.

United States Bankruptcy Court,
W.D. Tennessee, W.D.

March 7, 1986.

See also, Bkrtcy., 51 B.R. 633.

James N. Clay, III, Memphis, Tenn., for trustee.

William M. Gotten, Memphis, Tenn., for defendant.

## MEMORANDUM OPINION AND ORDER RE: MOTION FOR NEW TRIAL OR AMENDED JUDGMENT

WILLIAM B. LEFFLER, Bankruptcy Judge.

This cause is before the Court on the Plaintiff's motion for a new trial or, in the alternative, amendment of this Court's September 12, 1985 judgment for the Defendant. The Court denied the motion for a new trial but agreed to reconsider its judgment. The primary issue is whether the Court erred as a matter of law in ruling that no "undercharge" amounts are owed to the Plaintiff by the Defendant as the parties agreed upon and applied appropriate rate schedules (tariffs) to the freight shipments in controversy.

The following constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

Gordon's Transports, Inc. (Debtor) filed a Chapter 11 bankruptcy petition with this Court on February 9, 1983. The Chapter 11 Petition was converted to a Chapter 7 proceeding on April 14, 1983 and Mr. A.J. Calhoun, Esq. was appointed Trustee.

Prior to its Chapter 7 bankruptcy status, the Debtor was an interstate motor freight carrier with its principal offices in Memphis, Tennessee. The record reflects that on several occasions between November, 1981 and February, 1983, the Defendant employed the Debtor to transport various commodities from Kansas City, Missouri to locations in Tennessee, Louisiana, Alabama, Mississippi and Georgia.

It is the Trustee's position that the amounts charged and paid for these services were erroneous. According to the Trustee, the Debtor undercharged the Defendant because it applied the wrong rate schedules (tariffs) to the commodities transported. The amount allegedly due in Adversary No. 84–0262 is $22,229.88 while $1,483.57 is allegedly due in Adversary No. 85–0011. The Defendant contends that the correct tariffs were applied and nothing is owed the Debtor.

It is the Court's understanding that at the time of the shipments at issue there were four legally published, potentially applicable rates in effect. One was published by the Debtor itself pursuant to authorization obtained from the Interstate Commerce Commission (ICC) and is known as ICC GORD 209–A. Others were published by the Middlewest Motor Freight Bureau [1] and are known as ICC MWB 540–E and ICC MWB 240–E. Yet another was published by the Southern Motor Carriers Conference and is known as ICC SMC 560–B.

The commodities transported by the Debtor for the Defendant were icing paste, icing powder, cereals, grain flour, and edible flour. The rates charged for shipment of these items were derived from GORD 209–A and are of a type known as "distance" or mileage rates, i.e. the rates are based upon mileage.

The Trustee contends that these were inapplicable because of the following language taken from the then in effect regulation, 49CFR 1310.16(b)(i) and contained in GORD 209–A itself:

### DISTANCE COMMODITY RATES

Distance or mileage commodity rates named in this Section may be used only when no commodity rates, other than distance commodity rates have been published to apply from and to the same points over the same routes. ICC GORD 209–A, § 3, Item 4000, p. 60.

Pursuant to this language, according to the Trustee, the "distance rates" contained in GORD 209–A would not have been applicable were there other rates of a difference nature in effect for the same commodities at the same time. Therefore, the Trustee contends that the applicable rates were: For the grain flour and edible flour, the point to point commodity rate [2] found in MWB 240; for the icing paste and cereals, the class rate [3] found in MWB 540 and SMC 560, and for the icing powder, the point to point commodity rate in MWB 240 as well as the class rate in SMC 560.

At the same time the above quoted language contained in GORD 209–A was effective, so was the following language taken from a 1981 "Special Tariff Authority" issued to the Middlewest Freight Bureau from the ICC:

Authority is granted to depart from the necessary sections of 49CFR1310, but not 1310.14, to publish in all involved Bureau's Tariffs.... a new Rule or Item entitled "PRIORITY OF RATES, RULES, OR OTHER PROVISIONS OF INDIVIDUAL CARRIER'S TARIFFS," reading as follows:

Rates, Rules, or Provisions named in this tariff [do] not apply for the ac-

---

**1.** Regional Freight Bureaus are organizations composed of carriers who have grouped together to establish and publish rules, regulations, and rates for specific geographic areas. As their names imply, the Southern and Middlewest Bureaus cover those respective regions.

**2.** *Point to point commodity rates* are rates on specific items based on their being transported between specific points.

**3.** Class rates are rates assigned to items according to classes into which the items are grouped and the distance they are to be transported.

count of any individual participating carrier to the extent that such carrier provides conflicting or duplicating rates, rules, or provisions in any applicable tariff issued by such individual carrier and lawfully on file with the Interstate Commerce Commission. *Interstate Commerce Commission Decision, Special Tariff Authority No. 81–3077*, April 7, 1981. As required by this authority, these terms were published in the Middlewest tariff.

With respect to the Southern Motor Carrier Bureau's tariffs, there is before the Court a provision from the tariff known as ICC SMC 460–F which renders that tariff inapplicable to shipments made by Gordon's when and if there should be a Gordon's tariff in effect equally applicable to the same shipments. It does not appear that the same or similar language is present in the class rate tariff, SMC 560, which the Trustee contends is applicable to the icing paste, icing powder, and cereal transported within the Southern region. Moreover, SMC 560 is not specifically alleged to contain the special tariff authority language found in the Middlewest tariffs. However, the implication at pages 19 through 21 of Mr. David Jernigan's (Gordon's former traffic manager) deposition testimony is that all of the Bureaus adopted the same or similar language in their tariffs.

Counsel for both parties have done an excellent job of presenting evidence and citing cases regarding tariff interpretation and rate determination for the Court's consideration. From this information, it is the Court's understanding that pursuant to the Motor Carrier Act of 1980 and its purpose of deregulating the motor carrier industry, individual carriers were granted much more incentive to establish and apply their own tariffs than in the past. See "Congressional Findings as Motor Carrier Act of 1980," July 1, 1980, P.L. 96–296 § 3(a) reprinted at 49 U.S.C.S. § 10101, cumulative supplement. As a result, there existed at the time of the shipments in controversy, a belief in the correctness of and a trend toward the establishment and application of individual carrier tariffs.

Although none of the cases cited for the Court's consideration interpret the specific provisions present here, or, as here, provisions from different tariffs which must be construed together, they set forth the guidelines that are followed by courts to resolve tariff questions.

The essence of these guidelines appears to be as follows.

The terms of a tariff must be taken in the sense in which they are generally used and accepted; properly published tariffs are incorporated into any agreement between a shipper and a carrier and is a legal rate between them which cannot be varied; tariffs should be construed to avoid unjust, absurd, and improbable results and the practical application of the tariffs by interested parties should be considered in determining their meanings; if a tariff is unambiguous, it must be enforced according to its terms; generally, ambiguous tariffs are construed against their drafters; tariffs must be reasonable pursuant to 49 U.S.C. § 10704(a) and determination of such is left to the Interstate Commerce Commission. See, among others, *Penn Central Co. v. General Mills, Inc*, 439 F.2d 1338 (8th Ct.1971), *Scope Imports, Inc. v. I.C.C.* 688 F.2d 992 (5th Ct.1982), *Coca Cola Co. v. Atchinson T. and S.F. Ry. Co.* 608 F.2d 213 (5th Cir.1979), *Illinois Cent. Gulf R. Co. v. Tabor Grain Co.*, 488 F.Supp. 110 (N.D.Ill.1980); *Western Transport Co. v. Wilson and Co., Inc.*, 682 F.2d 1227 (7th Cir.1982).

It appears from the facts in the case at bar that, pursuant to the above guidelines and 49 U.S.C. § 10761(a), the parties applied a lawfully published tariff to the shipments at issue. In addition, from application of the above guidelines to the present facts, it is this Court's determination that the provisions of the "special tariff authority" found in the Middlewest tariffs and the provisions of the Gordon's tariff calling for application of other than distance rates if published, are ambiguous

when an attempt is made to construe them together to "avoid unjust or improbable results." Specifically, the Court finds that the language of the Middlewest provision which waives pertinent "portions of 49 C.F.R.1310 but not 1310.14" could have been and was "practically" construed by the parties involved as a waiver of the language found at 49 C.F.R. 1310.16(b)(1) and reproduced pursuant thereto in GORD 209–A. Furthermore, once compliance with the GORD 209–A provision was construed as waived, and it was determined that GORD 209–A contained no rates other than distance rates applicable to the specific commodities shipped, it was logical for the parties to classify them as foodstuffs and grains and apply the applicable thereto distance rates.

■ With respect to the Southern Motor Bureau's tariff, the Court does not have before it a provision from the tariff in question, SMC 560, that contains the waiver language discussed above. However, there is testimony to the effect that such language was adopted by all of the bureaus, including the Southern one, of which Gordon's was a member. Without such a provision, it appears that the GORD 209–A, Item 4000 provision taken from 49 C.F.R. 1310.16 and calling for application of rates other than distance rates when applicable would have remained effective. Consequently, the Southern tariff rates other than distance rates and otherwise applicable to the shipments at issue should have been employed.

In light of the above, this Court's judgment of September 12, 1985 is amended as follows:

IT IS HEREBY ORDERED that to the extent that this Court has determined that Special Tariff Authority 81–3077 issued by the Interstate Commerce Commission to the Middlewest Bureau had the effect of waiving the language found at Item 4000, GORD 209–A the appropriate rates were applied to the shipments made in the Middlewest region and the relief sought is denied, and

(2) To the extent that no similar provision was conclusively found to pertain to the Southern Motor Bureau tariff at issue, the appropriate rates for shipments made in that region were those from SMC 560 and the relief sought with respect thereto is granted.